HARTFORD ACCIDENT AND INDEMNITY COMPANY, Plaintiff,

v.

WESTERN FIRE INSURANCE COMPANY and the Western Casualty and Surety Company, Defendants.

No. 170.

United States District Court
E. D. Kentucky.
July 20, 1961.

James S. Carroll, Lexington, Ky., for plaintiff.

Boehl, Stopher, Graves & Deindoerfer, Louisville, Ky., Julian W. Knippenberg, Lexington, Ky., for defendants.

HIRAM CHURCH FORD, Chief Judge.

By this action Hartford Accident and Indemnity Company seeks to recover

from The Western Fire Insurance Company and The Western Casualty and Surety Company sums expended in defending a personal injury action arising out of an automobile accident and in satisfying the judgment recovered therein by the injured parties.

The basis of the Hartford claim is that at the time of the accident involved the defendants had in effect a policy of insurance covering the same risk as that which was covered by the plaintiff's policy and that defendants' insured was primarily responsible for the damages assessed as a result of the accident.

After considerable pre-trial procedure and other unaccountable delays, this case, filed in April 1958, is finally submitted to the Court for judgment upon a Stipulation as to the facts and issues presented.

In view of the facts stipulated, it seems essential to first determine whether, under the terms of the insurance policy issued by the defendants, the liability upon which plaintiff's claim rests was covered. The facts set out in the Stipulation so far as they appear relevant and material in the determination of this question of coverage are as follows:

"1. That on January 27, 1955, a standard combined automobile policy, was issued by the defendant, to Joe L. Mobley and Tennessee Corporation as named insureds upon a 1955 Buick automobile owned by the said Joe L. Mobley with coverage of $25,000.00 each person and $50,000.00 each accident and was in full force on May 14, 1955.

"2. That on May, 14, 1955, Joe L. Mobley was an employee salesman of Tennessee Corporation.

"3. That on February 1, 1955, a Comprehensive General and Automobile Liability Policy was issued by the plaintiff to Tennessee Corporation as named insured with coverage of $500,000.00 each person and $1,000,000.00 each accident and was in full force on May 14, 1955.

"4. That the policy of insurance issued by defendant contained the following provisions:

"I. Coverage A—Bodily Injury Liability

" 'To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, caused by accident and arising out of the ownership, maintenance or use of the automobile.'

"IV. Automobile Defined, Trailers, Two or More Automobiles, including Automatic Insurance

"(a) Automobile. Except where stated to the contrary, the word 'automobile' means:

"(1) Described automobile—the motor vehicle or trailer described in this policy:

"(3) Temporary Substitute Automobile—under coverages a, b, and c, an automobile not owned by the named insured while temporarily used as the substitute for the described automobile while withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction:

"V. Use of Other Automobiles

"If the named insured is an individual who owns the automobile classified as 'pleasure and business' or husband and wife either or both of whom own said automobile, such insurance as is afforded by this policy for bodily injury liability, property damage liability and for medical payments with respect to said automobile applies with respect to any other automobile, subject to the following provisions:

"(b) This insuring agreement does not apply:

"(2) To any automobile while used in the business or occupation of the

named insured, or spouse except a private passenger automobile operated or occupied by such named insured, spouse, chauffeur, or servant; * * *.

"9. That on May 14, 1955, Joe L. Mobley was involved in an accident causing death and personal injuries to passengers while operating a ½ Ton Ford Pickup truck owned by his father, a farmer.

"10. That there was no insurance coverage on the pickup truck.

"11. That judgment was rendered in the Clay Circuit Court of Kentucky by reason of death and personal injuries against Joe L. Mobley and Tennessee Corporation in the sum of $12,500.00.

"12. That plaintiff defended said action.

"13. That defendant did not defend said action.

"14. That defendant satisfied judgment as to Tennessee Corporation in the sum of $6,250.00 and expended $1,975.74 as attorney fees and $471.40 as costs. A total expenditure of $8,677.14.

"15. A copy of the deposition of Joe L. Mobley is or will be filed herein to be considered concerning the issue of a substitute automobile or other automobile."

As to the issues presented, the Stipulation provides:

"Issues

"(a) Was Joe L. Mobley operating a substituted automobile or other automobile under the provisions of the defendants' policy?

"(b) If the Court finds in the affirmative as to issue (a) the following issues apply:

"(c) Did the defendant have primary coverage to Joe L. Mobley and Tennessee Corporation in the operation of a ½ ton pickup truck by the said Joe L. Mobley?

"(d) There's the prorate clause of defendant's policy:

" 'Condition 18' precludes recoverage to plaintiff except upon a mathematical basis."

By agreed order of February 20, 1961, the above issue designated as "(d)" was corrected to read as follows:

"Do the prorate clauses in the plaintiff's and the defendants' policies preclude recovery to plaintiff except upon a mathematical basis."

Obviously, the determination of the questions whether the automobile involved in the accident was a temporary substituted automobile or another automobile afforded coverage under the terms of the contract requires that we look to the provisions set out in the policy which control in respect to its coverage and fix the liability of defendants. We find that under the policy issued by defendants as set out in Paragraph IV (3) of the Stipulation a temporary substituted automobile is permissible only while the specifically insured automobile described in the contract was "withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction", and that under the provisions of the insurance contract with respect to the use of "other automobiles" as set out in Paragraph V (b) of the Stipulation, it is provided:

"V. Use of Other Automobiles.

"(b) This insuring agreement does not apply:

"(2) To any automobile while used in the business or occupation of the named insured, or spouse except a private passenger automobile operated or occupied by such named insured, spouse, chauffeur, or servant."

The only evidence introduced by the plaintiff to sustain the burden of showing that the 1955 Buick automobile specifically described in the policy, at the time the pickup truck was substituted for it on May 14, 1955, was "withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction" is the testimony set out in the deposition of Joe L.

Mobley, taken on January 18, 1961, more than 5½ years after the accident, from which it appears that:

On May 14, 1955, when the accident happened, the witness, Mr. Joe L. Mobley, one of the insured under the policy issued by defendants, owned the new 1955 Buick Special automobile specifically covered by the policy, but at the time of the accident Mobley was driving a Ford Pick-up truck owned by his father. It appears that on the day of the accident Mr. Mobley was visiting his relatives at Oneida, Clay County, Ky., and for some reason decided to make a trip into the country where the roads were rough and unimproved. He described these roads in answer to question 9 on cross-examination thus: "They are country roads but they are navigable. People travel them, but they are not good roads, by any means. I could have gotten there in my Buick had it been operating". In answer to question 22 on cross-examination he said: "There was nothing seriously wrong with the car. It seemed to be flooding in the carbureter, which would temporarily put it out of action, sometimes for an hour and sometimes for a half hour and then it would start later on". In answer to questions 23 and 24 on cross-examination, he said: "Q. 23. On this particular occasion though, rather than wait for anything else, you went on and borrowed your father's truck? A. Yes, I was in a hurry. Q. 24. What was your hurry occasioned by? A. I don't know specifically except I had an errand to do. Fact is, on these occasions it is a family visit and I had some social engagement, I presume. I don't know specifically at this time, but I didn't want to wait. I wanted to go on and saw no particular reason to wait because his truck was there handy." When he found that the Buick car did not start promptly, which he attributed to "flooding", he said: "The truck was setting there at Dad's, so I jumped in it and took off". He described it as an old model Ford Pick-up truck, possibly around a 1950 model.

Notwithstanding the insistence of the witness at this time, 5½ years after the accident, that his reason for substituting the pick-up truck for his new Buick car was that the Buick would not start, on cross-examination he testified as follows:

"Q. 10. Following the accident, I will ask you if you didn't stop in the office of which I am associated with and give this statement to Mr. Warren Breeding who was investigating this accident for Western Casualty and Western Fire Insurance Companies? A. Where would that be located?

"Q. 11. 1010 First National Bank Building here in Lexington? A. I probably did.

"Q. 12. Do you recall whether or not you gave him a statement which he wrote and you later signed? A. I don't specifically recall.

"Q. 13. Go ahead. A. I signed a lot of statements and was involved with a lot of people and depositions and legal proceedings that followed this thing.

"Q. 14. I will ask you whether or not you gave Mr. Breeding a statement that you borrowed your dad's truck for the errand because the terrain was rough? A. I possibly did. However, this would not be why I would have chosen the truck rather than borrow some other vehicle or automobile.

\* \* \* \* \* \*

"Q. 32. Do you recall telling Mr. Breeding in that same statement that you borrowed your father's truck to use in that neighborhood for the errand because the terrain was rough and because the Buick was new and seemed to race? A. I don't recall that specific statement, but certainly this is rough terrain.

"Q. 33. Do you recall telling him that is why you borrowed the truck? A. No.

"Q. 34. Do you recall signing the statement when he got through writing it? A. I assume that I did. I don't recall this particular instance. I couldn't separate this from any

number of other statements that I gave.

"Q. 35. You gave several different statements? A. Yes, and I would assume that that is not a forged document.

"Q. 36. You would recognize your signature, wouldn't you? A. Yes.

"Q. 37. Is that your signature? A. Yes, it is.

"Q. 38. So you will not say what is in this four page statement is not what you told Mr. Breeding? A. No, I think that is substantially so. I see no reason why I should not have given him the facts as I could recall them. However, I would not say that that is 100 percent correct, but I am sure it is largely so. Particular details at a time like this are lucid and sometimes you are trying to think back motives are not clear as to why you made a particular move.

"Q. 39. Then I take it your memory then would have been much clearer on May 31, 1955, just a couple of weeks after the accident, than it would be now? A. You would normally expect that, yes.

\*     \*     \*     \*     \*     \*

Re-Cross-Examination.

"Q. 1. Now about 5½ years after this accident, you are sure that you could not start the Buick on this occasion, is that true? A. I am not sure of the particular mechanical defects of why the Buick wouldn't start.

"Q. 2. But you couldn't start it? A. As I recall, it wouldn't start at all. It was a new car and never operated perfectly.

"Q. 3. And when you concluded your visit that weekend, did you then drive the car back to your home in Carrollton? A. I did.

"Q. 4. Was it necessary to have any work done on it before you drove it from your father's back to Carrollton? A. No."

In view of Mr. Mobley's frank statement made a short time after the accident as to his reasons for substituting his father's pickup truck for his new Buick automobile for the trip, in the course of which the accident took place, and his admission that he drove his Buick automobile upon his return to his home at Carrollton, Ky., without difficulty, I am of the opinion that the testimony of Mr. Mobley falls far short of showing that at the time of substituting the pickup truck for his Buick car that his Buick was withdrawn from "normal use because of its breakdown, repair, servicing, loss or destruction."

The testimony of Mr. Mobley seems convincing that his reason for substituting the pickup truck was that he was planning to travel over a rough mountain road and he chose the old truck rather than his new Buick for that kind of travel.

I find nothing in this record by way of proof or otherwise to sustain the plaintiff's contention that the Ford ½ ton pickup truck in question is a vehicle within the meaning of the phrase "private passenger automobile", set out in paragraph V (b) (2) of the Stipulation, or that it was ever so used. In respect to a similar vehicle designed and "used for hauling light cargo", in Senn's Adm'x v. Michigan Mutual Liability Company, 267 S.W.2d 526, 527, the Kentucky Court of Appeals said that such clause is not ambiguous and "although the vehicle might have been used occasionally to haul passengers, it was not primarily a passenger vehicle and such occasional use would not as a matter of law convert it into a passenger vehicle."

We recognize the rule that ambiguous provisions of insurance policies should be construed strictly against the insurer and liberally in favor of the insured so as not to defeat the intended purpose of the policy, "But this does not mean that courts in giving a liberal construction to a policy can ascribe to it a

**424**

meaning not coming within the limits of the language of the contract of insurance. Nor can courts read into it conditions and terms not incorporated therein." United States Fidelity & Guaranty Co. v. Lairson, Ky., 271 S.W.2d 897, 898. "The court cannot disregard the plain, unambiguous language of the contract." United Insurance Company of America v. Gerstle, Ky., 339 S.W.2d 945, 946.

For the reasons indicated, I am of the opinion that the Ford ½ ton pickup truck which was operated by Joe L. Mobley at the time of the accident in question was not a "substituted automobile or other automobile" covered by the provisions of the insurance contract issued by the defendants, and plaintiff's claim should be dismissed.

This conclusion renders it unnecessary to consider or determine other defenses presented to plaintiff's claim or other issues which would arise if the conclusion were otherwise.

Let judgment be entered in conformity herewith.